**Frederick BLUNT, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 04–CF–1409.

District of Columbia Court of Appeals.

Argued Sept. 29, 2008.

Decided Oct. 30, 2008.

Joshua Deahl, Public Defender Service, with whom James Klein, Jaclyn Frankfurt, and Eve Hanan, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Mary B. McCord, and Ann M. Carroll, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, FARRELL, Associate Judge, Retired, and KING, Senior Judge.

FARRELL, Associate Judge, Retired:

Appellant (hereafter Blunt) was found guilty by a jury of armed voluntary manslaughter and possession of a prohibited weapon, both arising from the death of Robert Ford. On appeal, Blunt first argues that the trial judge erroneously allowed a prosecution witness to explain that she was afraid to testify because she had been "stabbed nine times and almost lost my life by testifying"—inferentially to the grand jury in this case—when no evidence linked Blunt to the stabbings. The judge immediately told the jury that there was "no evidence that Mr. Blunt participated in any way connected to that incident" and that the testimony "was only ... relevant to the witness' presentation." Despite this instruction, we agree with Blunt that the witness' mention of the stabbings as the reason for her fear was more prejudicial than probative in the circumstances, and should not have been permitted. But we hold that the error was harmless for the reasons to be stated.

Second, Blunt argues that his right to confront the same witness was violated by the introduction of her grand jury testimony as substantive evidence under D.C.Code § 14–102(b)(1) (2001),[1] because

---

1. That subsection states in relevant part:
 A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was

her inability to remember the events of the crime or the contents of her grand jury testimony was not genuine but feigned. We conclude, to the contrary, that Blunt was afforded the opportunity that the Constitution requires to confront the witness on cross-examination. We therefore affirm.

## I.

Sandra Williams was outside her mother's home one evening in mid-August when she saw three men gambling on the sidewalk. One of them was Blunt, whom she had known as "Fats" for seven years. Williams watched as a second man, "Dayton," snatched ten dollars from the hand of the third player, later identified as Robert Ford, whereupon Ford hit Dayton in the chest and the two began fighting. Ford soon pinned Dayton against a car and punched him repeatedly, causing Dayton to yell to Blunt for help. Blunt went to a nearby alley and picked up a cinder block which he hoisted above his head. Then, according to Williams and two other eyewitnesses, he used it to strike Ford repeatedly in the head or body while also kicking him. When Ford rose from the ground at one point and chased Blunt, Blunt retrieved a second block and again struck him on the head and ribs despite Ford's appeal to stop ("why you doing this, it [was] a one on one fight?"). After delivering further blows to Ford, Blunt ran from the scene when an eyewitness called the police.

Ford died early the next morning. An autopsy revealed that he had suffered serious internal hemorrhaging from head and body blows, which in turn aggravated a pre-existing hypertensive cardiovascular disease by reducing the volume of his cir-

culating blood and the supply of oxygen to his heart. The hemorrhaging also triggered a "generalized sickling phenomenon" (Ford suffered from sickle cell trait), whereby his red blood cells became "twisted and [were] plugging all the capillaries of all the organs in the body ... and also at the site[s] of the hemorrhage." According to the medical examiner, Ford's pre-existing conditions combined with the "multiple blunt impact trauma with soft tissue hemorrhage" to cause his death through deprivation of oxygen to the heart and a "cardiac event." The jury rejected the contrary opinion of Blunt's medical expert that, rather than blunt-impact trauma, Ford had died from "exertional rhabdomyolisis," a release of toxic substances in the blood caused by "fighting in a hot humid stressful climate under circumstances where he was at risk through dehydration and alcohol, as well as having a rather large body mass index." The jury also rejected Blunt's defense of justification, *i.e.*, defense of himself or a third person, but convicted him of armed voluntary manslaughter as a lesser-included offense of armed second-degree murder.

## II. Witness Fear

### A. Background

Before trial, the prosecutor informed the judge that Sandra Williams was afraid to testify and would be a reluctant witness. The prosecutor asked that Williams be allowed to explain her fear, specifically that she had been stabbed eight months earlier, that a gun had been fired through the floor of a house when she was present there, and that "random people" had warned her that "nobody likes snitches on her block." Williams held Blunt indirectly

---

given under oath subject to the penalty of perjury at a trial, hearing, or other proceed-

ing. . . .

responsible for these actions. Over defense objection, the judge ruled that Williams could "say whatever she thinks is causing her to be motivated to fear coming here today,"[2] and that any "negative inference towards [Blunt] because she may be fearful" could be prevented by an immediate limiting instruction, which she asked the parties to draft jointly.

When Williams took the stand at trial, she admitted being home on the day of the charged crimes but denied remembering anything about them. The prosecutor sought to refresh her memory with her grand jury testimony given two days after the crimes, but Williams declined to read it. After the judge intervened, Williams apparently read the proffered transcript but testified that it did not refresh her memory of the events described therein. At a bench conference, the prosecutor sought leave to question her about why she had been crying ever since she took the witness stand. The judge granted leave, noting that "that's such unusual behavior[,] that she's been crying throughout [her testimony]" and looking away from the jury.

The prosecutor then asked Williams the following questions:

Q.: Ms. Williams, can you tell us why you are crying?

A.: Because I hurt, right now I'm stressed.

Q.: Why are you stressed?

. . . .

A.: Because I have been through a lot because I testified. I have been stabbed nine times and almost lost my life by testifying. So I'm stressed and I'm scared right now.

After a bench conference, the judge instructed the jury as follows:

You just heard the witness testify with regard to having been stabbed and I want to make clear for the record to you there is no evidence that Mr. Blunt participated in any way connected to that incident. You are not to make [an]y negative inference from the fact that Ms. Williams may have been stabbed, nor are you to speculate that Mr. Blunt was in any way linked to the fact that Ms. Williams was stabbed.... The reason that you were hearing about that was only as it's relevant to the witness' presentation.

The prosecutor again tried, unsuccessfully, to refresh Williams' recollection using the grand jury testimony, then was allowed to question her in detail about its contents, thus presenting it to the trial jury as substantive evidence.

## B. Discussion

 Issues arising from fear expressed by government witnesses on the stand have been a recurrent part of criminal appeals in this court in recent years. Recognizing the high potential for prejudice in such evidence, *see Gordon v. United States*, 783 A.2d 575, 586 (D.C.2001), but also the prosecution's legitimate need to explain reluctance or hostility by a subpoenaed witness, *id.*, the court has sought to impose proper limits on the admissibility of such testimony when, as here, no showing of intimidation of the witness by the defendant (or his surrogates) has been made. Blunt concedes, in keeping with our decisions, that Williams' "fear was relevant because it explained her reluctance to testify and her courtroom demeanor," and thus that she fairly could have been allowed to "testify with a general statement that she feared retaliation and was

**2.** "[S]he can say she's afraid. She can say what happened to her ... [S]he's justified in giving the concrete basis for her fear."

only present in court to testify because she was under subpoena" (Br. for App. at 32). He argues, however, that the judge erred in letting Williams go further and specify the reason she gave for her fear, in circumstances where the prosecutor had shown no special need for the jury to learn that she had been stabbed "because [she] testified" in this case. We agree, and hold that a limiting instruction was not an adequate substitute for exclusion of that testimony in the circumstances.

■ "[E]vidence of a witness' generalized fear, not specifically a fear of the defendant, may be admissible, in the court's discretion, to show bias or motive when the witness has ... withheld information or makes conflicting statements." *Parker v. United States,* 797 A.2d 1245, 1249 (D.C.2002) (internal quotation marks omitted). A sensitive balancing of probative value versus prejudice is called for in this area, *see Gordon,* 783 A.2d at 586; *Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999) (*Mercer I*), one requiring the trial judge to assesses the danger that the jury may glean not just a "generalized fear" from the witness' testimony but one implying a cause linked (without evidence) to intimidation by the defendant. That case-by-case balancing, in our view, does not allow for a broad ruling that a witness (in the trial judge's words here) may "say whatever she thinks is causing her to ... fear coming here" so long as the jury is admonished not to link those reasons to the defendant. Although a forceful limiting instruction may serve to prevent such speculation in some cases, the likely efficacy of an instruction must be assessed in each case against the danger inherent in the explanation for fear that the witness is expected to give.

Testimony by Williams that she had been stabbed repeatedly for her prior testimony in the same case carried a serious risk of implying an unfounded link to Blunt. In Williams' mind, at least, she had been stabbed by persons bent on retaliating for her earlier testimony in the case. Jurors finding her sincere[3] could be tempted to "speculate," despite the court's limiting instruction, that no one else had the same motive to retaliate as did Blunt or persons acting for him. Thus the potential for unfair prejudice was real. At the same time, the government's need for a particularized explanation had not yet been shown. Williams testified about the stabbings on direct examination, before the defense exercised its choice on cross-examination whether to attack her veracity in purportedly being unable to recall events or her prior testimony. Our decisions have made timing a significant factor in assessing the prosecution's need to counter "damage [to its] case" by adducing reasons for a witness' lack of cooperation on the stand. *Foreman v. United States,* 792 A.2d 1043, 1049 (D.C.2002); *see Gordon,* 783 A.2d at 586 ("*Given Gordon's cross-examination of Gravette,* the government was ... entitled to further explore ... with the witness the reasons for her reluctance to testify at trial in a manner consistent with her prior grand jury testimony" (emphasis added)). Equally relevant, if not more, in weighing the government's need is the rehabilitation it could expect to receive from the admission of Williams' grand jury testimony, see note 1, *supra,* if, as anticipated, her trial testimony was inconsistent with it. Williams' fear, even unexplained, was not destined to deprive the prosecution of substantive use of her past accusations of Blunt.

---

3. The government does not seriously dispute that Williams' explanation allowed an inference that she had been stabbed because of her grand jury testimony, given two days after the events charged.

For these reasons, proper testimony by Williams on direct about the reason for her fear of testifying should have been limited—in Blunt's words on appeal—to a general statement that she feared retaliation.[4] Relying on a jury instruction to neutralize the risk of prejudice from her more particular explanation that she had been stabbed for testifying in this case, when the prosecution's need for the explanation had not been demonstrated, afforded too little protection for the defendant in this area fraught with the risk of unfair inferences of witness intimidation.

■ We conclude, all the same, that letting Williams refer to the stabbings was harmless error under the non-constitutional standard we apply in this context. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Murray v. United States,* 855 A.2d 1126, 1134 (D.C.2004); *Gordon,* 783 A.2d at 588. First, in assessing prejudice from error of this kind, we may—as Blunt acknowledged at oral argument—take into account the same instruction the trial judge gave, forcefully and immediately, after Williams explained her fear. *See, e.g., Murray,* 855 A.2d at 1134 (one factor in assessing prejudice from the improper fear argument is the likely "effect of specific corrective instructions" given by the judge). Even if we discount, and we do not entirely, the judge's perception that the jury here "absorbed [as] important information" the content of the limiting instruction (by nodding their heads affirmatively as it was given), our decisions recognizing the efficacy of "emphatic curative instruction[s]," *Moore v. United States,* 927 A.2d 1040, 1063 (D.C.2007); *see Frye v. United States,* 926 A.2d 1085, 1094 (D.C.2005), provide some assurance that the jury did

not blame Blunt for the stabbings and so treat them as evidence of his bad character or consciousness of guilt. Moreover, in keeping with the instruction, the prosecutor in closing argument commented on Williams' demeanor—"[W]hen I asked her . . . why she was behaving that way, she said that she was scared . . . that she had been stabbed"—but added that "[t]here is no allegation that Mr. Blunt had anything to do with that." That circumstance is in contrast to cases where, we found, the prosecutor had sought to exploit the link between fear and the defendant in summation. *See, e.g., Murray,* 855 A.2d at 1133–34; *Ebron v. United States,* 838 A.2d 1140, 1151 (D.C.2003).

Furthermore, Williams' mention of the stabbings came on the first day of trial testimony and was succeeded by the testimony of multiple fact witnesses as well as experts who testified at length about the cause of death. More importantly, in its deliberations and verdict the jury appeared to grapple carefully with the admissible evidence and legal issues, in particular the distinction between second-degree murder and voluntary manslaughter. During deliberations it requested "further guidance [from the court] regarding the issue of mitigating circumstances" and "the government's burden . . . to prove beyond a reasonable doubt that there were no mitigating circumstances" to convict of second-degree murder. After reinstruction and more deliberation, it returned a verdict of armed voluntary manslaughter, rejecting the charge of armed murder. These circumstances reinforce our confidence that the jury was not swayed by any "specious link," *Carpenter v. United States,* 635 A.2d 1289, 1294 (D.C.1993), between Blunt and the post-crime stabbings

4. We have said, for example, that a witness may mention general fear of "retaliation for snitching" so long as it is not linked in any

way to the defendant. *Clayborne v. United States,* 751 A.2d 956, 964 (D.C.2000).

in evaluating the evidence of his guilt. *See United States v. Qamar*, 671 F.2d 732, 737 (2d Cir.1982) ("The jury's acquittal on a second count and its inability to agree on a third count belie the suggestion that the death threat testimony so inflamed the jurors' passions that Qamar was denied a fair trial.").

Finally, the evidence that Blunt killed Ford with cinder blocks without adequate provocation was very substantial. Williams told the grand jury that she had watched as Blunt twice picked up cinder blocks and "hit [Ford] constantly" in the head and ribs even after Ford had tried to run away ("Fats [Blunt] ... was chasing him.... The man then fell to the ground ... Fats ... took the cinder block hitting him repeatedly, kicking him [sic] in his head with the cinder block.") Gladys Mack, a neighbor who "would see [Fats] every day," confirmed that he had intervened in the fight by holding a "concrete mason [block] aim[ed] in an upright motion," which he then "threw across [Ford who] was on the ground on his back." Mack called 911 and told the police "[t]hey are trying to kill this boy"; she could not "believe" what she saw—"something you see in cartoons"—as she watched Blunt "strike him" with the cinder block while Ford was on the ground.[5] Ernestine Roland, also a nearby resident who knew Blunt from the neighborhood, stated that she saw him holding a cinder block over his head, then hit Ford in the back of the head with it as a third man kicked him. She left the scene after watching Ford "get beat up ... [w]ith [the] cinder block" or a "big piece of it," which Blunt used to "hit him on the head ... hard." Lastly, Agnes Johnson witnessed enough of the events to see a man holding a cinder block over his head and circling two others (one

held in a headlock) as if trying to strike one with it without hitting the other. She identified Blunt to the police as the man who had held the cinder block.

For these combined reasons, we can say "with fair assurance ... without stripping the erroneous action from the whole ... that the judgment was not substantially swayed by" the erroneous admission of the stabbing testimony. *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239.

## III. Confrontation

■ Blunt further contends that he was denied his Sixth Amendment right to confront Sandra Williams because she "essentially declined" to be cross-examined by pretending that she could not recall either the events of the crime or the contents of her grand jury testimony. Conceding, as he must, *see United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), that a genuine inability to remember does not make a witness "unavailable" for purposes of confrontation, Blunt argues that a feigned inability to recall—he cites what amounts to a finding by the trial judge that Williams, "when she was testifying, was making a false claim of a failure to recall"—is constitutionally different from a genuine one, relying in particular on *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). We do not agree that the Sixth Amendment draws that line.

### A. Background

When Williams took the stand, she admitted having been home on the day of the crimes and that she had been outside at the relevant time. She admitted also knowing Blunt from the neighborhood "back in 2001" and that he "look[ed] different" at trial from his appearance then.

---

**5.** Mack corroborated Williams' observation of Ford struggling "to explain what he did that led to" the fight, instead of "trying to fight back." "He was just trying to get away."

But she denied recalling anything about the crimes. Later on direct examination, she recalled testifying before the grand jury and having sworn to tell the truth there, but when asked repeated questions about her testimony, answered each time that she did not remember or recall. On cross-examination she went a single step further and, in response to a question about a detail she had mentioned to the grand jury, said that "[t]he testimony that I gave in 2001 was accurate at the time to my knowledge, but right now I don't remember." [6] Otherwise, as on direct examination, she claimed not to remember anything of what she had told the grand jury.

The trial judge, concluding that her in-court testimony was inconsistent with her grand jury testimony, see D.C.Code § 14–102(b)(1), and that her presence on the stand under oath subject to cross-examination met confrontation requirements, admitted the grand jury testimony as substantive evidence. *See generally Mercer v. United States*, 864 A.2d 110 (D.C.2004) (*Mercer II*).

### B. Discussion

If Blunt "had no opportunity" or a constitutionally "[in]adequate opportunity" to cross-examine Williams, his right of confrontation was violated. *Crawford v. Washington*, 541 U.S. 36, 57, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The question before us is what that "opportunity" means, something on which two decisions, *United States v. Owens, supra*, and *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985), shed decisive light in this case.

■ "[W]hen a hearsay declarant is present at trial and subject to unrestricted cross-examination[,] ... the traditional protections of the oath, cross-examination,

and opportunity for the jury to observe the witness' demeanor satisfy [Sixth Amendment] requirements." *Owens*, 484 U.S. at 560, 108 S.Ct. 838. In *Owens*, the government witness recalled having identified the defendant as his assailant in an FBI interview, but could not presently remember anything about the crime (including even seeing his assailant), thereby limiting the defendant's ability to cross-examine him. *Id.* at 556, 108 S.Ct. 838. Nevertheless, given the protections cited above, the Supreme Court found no constitutional impediment to admission of his prior identification under FED.R.EVID. 801(d)(1)(C), stating: "We do not think that a constitutional line drawn by the Confrontation Clause falls between a forgetful witness' live testimony that he once believed this defendant to be the perpetrator of the crime, and the introduction of the witness' earlier statement to that effect." *Id.* at 560, 108 S.Ct. 838. In *Owens*, as in *Fensterer*, "the factfinder [could] observe the witness' demeanor under cross-examination, and the witness [was] testifying under oath and in the presence of the accused." *Fensterer*, 474 U.S. at 20, 106 S.Ct. 292. This sufficed as constitutional protection, because the Sixth Amendment "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Owens*, 484 U.S. at 559, 108 S.Ct. 838 (emphasis in original, citations omitted). As the Court has confirmed most recently, "[W]hen the declarant *appears for cross-examination at trial*, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 60 n. 9, 124 S.Ct. 1354 (emphasis added).

---

6. The government does not argue that Williams thereby adopted her grand jury testi-

mony or that this answer bears particularly on the confrontation issue.

Blunt does not assert that his right to question Williams was "restricted" by the trial court. *See Owens,* 484 U.S. at 561–62, 108 S.Ct. 838 ("limitations on the scope of examination by the trial court" may undermine "meaningful cross-examination"). Instead he argues that her feigned inability to recall either the events of the crime or what she had told the grand jury amounted to an "assertion[ ] of privilege by the witness," *id.* at 562, 108 S.Ct. 838 which likewise rendered cross-examination of her meaningless. A feigned inability to recall, however, is only a form—aggravated, to be sure, if maintained consistently—of deliberate evasion, and in both *Owens* and *Fensterer* the Court explained:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Owens,* 484 U.S. at 558, 108 S.Ct. 838 (quoting *Fensterer,* 474 U.S. at 21–22, 106 S.Ct. 292). Thus, among the "infirmities" of the witness which the defense may expose by questioning, and by recalling to the jury's attention in summation, are evasive answers, or a "failure to answer … candidly." WEBSTER'S THIRD NEW WORLD DICTIONARY 787 (2002) (defining "evasion").

That opportunity "to impugn the witness' statement" satisfies the constitutional guarantee, even if it does not guarantee "success[ ]." *Owens,* 484 U.S. at 560, 108 S.Ct. 838.

Blunt responds that both *Owens* and *Fensterer* involved an apparent genuine loss of memory by the witness, noting, for example, the Court's observation in *Owens* that the defense could bring out (besides "such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight") "the very fact that he has a bad memory." *Id.* at 559, 108 S.Ct. 838. But nothing in *Owens* or *Fensterer* suggests that the Court was reserving judgment on the distinction Blunt makes between real and merely asserted memory loss. *See, e.g., id.* at 563, 108 S.Ct. 838 ("It would seem strange … to assert that a witness can avoid introduction of [prior] testimony … inconsistent with his trial testimony … *by simply asserting* lack of memory of the [underlying] facts" (emphasis added)).[7] We therefore agree with the Seventh Circuit's rejection of a similar distinction:

> [Appellant] Park tells us that the victim in *Owens* had genuine rather than feigned amnesia, and could at least remember making the identification (which Long [the witness here] purported to be unable to do), but neither difference matters. The Supreme Court's point was that the confrontation clause (and [FED. R. EVID. 801(d)(1)(C) ] ) are satisfied when the witness must look the accused in the eye in court; shortcomings in the declarant's memory may be made known to the jury.

7. The distinction may be a difficult one to recognize in any event, at least in the case of a fearful witness such as Williams. Although the trial judge found that her claim of memory loss was "false," it appeared to the judge to stem from "an affirmative desire to have no memory." (On cross-examination, for example, Williams had said: "I don't remember it. I don't want to remember it. And it has been hard for me to erase this from my memory and so I don't want to remember this again.") Perhaps only a psychologist or neuroscientist can opine confidently whether a witness is able, as Williams tried to do, to *will* herself into not remembering.

*United States v. Keeter,* 130 F.3d 297, 302 (7th Cir.1997); *see also People v. Perez,* 82 Cal.App.4th 760, 98 Cal.Rptr.2d 522, 526 (2000) ("Even though [the witness] professed total inability to recall the crime or her statements to police, and this narrowed the practical scope of cross-examination, her presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements. This was all the constitutional right to confrontation required.") [8]

Here, although defense counsel drew from Williams almost nothing on cross-examination but failure to recall, he pointed to that behavior in closing argument, noting her "unwilling[ness] to come to court here to testify ... and say, yes, what I said to the grand jury is true" and suggesting that, since she "wouldn't even look at you" while testifying, the only fear prompting her silence was "fear[ of] being charged with perjury." Pointing also to the lack of "evidence that anyone" in the grand jury ("no judge[,] ... no defense counsel") "questioned Sandra Williams' motive as to why she would say what" she said there, defense counsel gave the jury reasons, in short, to accord "scant weight to [her] testimony," *Owens,* 484 U.S. at 558, 108 S.Ct. 838, albeit reasons drawn from questioning not "effective in whatever way, and to whatever extent, the defense might [have] wish[ed]." *Id.* at 559, 108 S.Ct. 838 (citations omitted).

Blunt nevertheless argues that a conclusion that his right to confront Williams was violated is dictated by *Douglas v. Alabama, supra.* We disagree. In *Douglas* the witness was sworn and, invoking the privilege against self-incrimination, "refused to answer any questions concerning the alleged crime." 380 U.S. at 416, 85 S.Ct. 1074. The prosecutor then, "[u]nder the guise of cross-examination to refresh [his] recollection," questioned him in detail about a prior signed confession, and as to each question, the witness "asserted the privilege and refused to answer." *Id.*[9] The defendant's "inability to cross-examine [the witness] as to the alleged confession," the Court held, denied him his right of confrontation. *Id.* at 419, 85 S.CT. 1074. Indeed, the witness' "reliance upon the privilege created a situation in which the jury might improperly infer both that the [confession] had been made and that it was true." *Id. Douglas* thus fits (if it is not the source of) the paradigm distinguished in

---

**8.** It does not matter, in our view, that the witness in *Owens* remembered having made the prior identification (much as Williams recalled having testified before the grand jury, even asserting the accuracy of her testimony there). As the District of Columbia Circuit has reasoned:

> The idea [asserted] is that if the witness recalls his prior testimony while forgetting why he said what he did, cross-examination is more meaningful than if ... the witness does not even recall his earlier testimony. We believe the Supreme Court in *Owens* put this argument to rest. It is true that in *Owens* the witness at least recalled having identified the defendant. 484 U.S. at 556, 108 S.Ct. 838. But the Court did not restrict its reasoning to such situations. Instead, the Court "agree[d] with the answer

suggested" in "Justice Harlan's scholarly concurrence" in *California v. Green,* 399 U.S. 149, 188, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), that "a witness' inability to 'recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence.'" 484 U.S. at 558, 108 S.Ct. 838. *United States v. Milton,* 303 U.S.App. D.C. 386, 394, 8 F.3d 39, 47 (1993).

**9.** The witness did so despite the threat of contempt, after the trial judge ruled that his previous conviction for the same crime had made the privilege unavailable to him. 380 U.S. at 416, 85 S.Ct. 1074.

*Owens,* 484 U.S. at 562, 108 S.Ct. 838, where "assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination ... no longer exists." *See United States v. Torrez–Ortega,* 184 F.3d 1128, 1132–34 (10th Cir.1999) (witness' refusal to answer questions "because of his obstinate and repeated assertion of the privilege against self-incrimination" made him not subject to cross-examination under *Douglas;* court rejects "the government's attempt to link by analogy cases in which a witness professes loss of memory—real or otherwise—and cases in which a witness simply refuses to testify on the basis of an assertion of privilege"); *United States v. Casamento,* 887 F.2d 1141, 1186 (2d Cir.1989) (confrontation right is violated under *Douglas* when "a witness' *refusal* to answer questions creates inferences unfavorable to the defendant and crucial to the government's case" (emphasis added)); *United States v. Insana,* 423 F.2d 1165, 1168 (2d Cir.1970) (witness' insistence that "he could not remember the relevant facts" did not deny confrontation because he "took the stand and was at all times available for cross-examination," a situation "quite different" from that in *Douglas* and *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), "where the defendant had no opportunity to cross-examine ... because [the witness] was legally unavailable"); *United States ex rel. Trejo v. Schomig,* 2003 WL 548364 at *5, 2003 U.S. Dist. LEXIS 2657 at *17 (N.D.Ill. Feb. 24, 2003) ("The Court in *Douglas* based its decision on the fact that the witness refused to answer at all. Here, [the witness'] ... memory lapse, feigned or real, did not result in a violation of Trejo's Sixth Amendment right of confrontation.")

Williams asserted no privilege and did not refuse to answer questions. "[T]estifying under oath and in the presence of the accused," *Fensterer,* 474 U.S. at 20, 106 S.Ct. 292, she asserted, honestly or not, inability to remember the events of the crime and the contents of her grand jury testimony. "[T]he factfinder [could] observe her demeanor" as she so testified, *id.,* and Blunt attacked her bias (*i.e.,* avoidance of a perjury charge) and veracity in summation—infirmities "often a prime objective of cross-examination" to expose. *Owens,* 484 U.S. at 559, 108 S.Ct. 838. Blunt asserts that he faced a dilemma in attacking her, since Williams would have a ready answer to suggestions on cross that she was being dishonest in professing no memory and feared only a perjury prosecution: her fear resulting from the stabbings. But although that consideration supports the principle we emphasized in part II, *supra*—i.e., that the judge must exercise real care before admitting an explanation of fear the jury may be tempted to link to the defendant—it is not a reason to construe the right of confrontation in a manner inconsistent with *Owens* and *Fensterer.*

Finally, we treat briefly Blunt's footnote argument that, as an *evidentiary* matter, Williams was not "subject to cross-examination concerning" her grand jury testimony, § 14–102(b), because she "essentially declined[d] to testify." Br. for App. at 39 n. 20; *see id.* ("Williams ... simply refuse[d] to testify at trial."). We have already rejected the premise of the argument. Further, this court draws guidance in construing § 14–102 from federal court decisions interpreting the parallel provisions of FED.R.EVID. 801(d)(1). *See Mercer II,* 864 A.2d at 114; *Sparks v. United States,* 755 A.2d 394, 399–400 (D.C.2000). "A well-settled body of case law holds that where a declarant's memory loss is contrived it will be taken as inconsistent with a prior statement for purposes of applying Rule 801(d)(1)(A)." *United States v.*

*Knox,* 124 F.3d 1360, 1364 (10th Cir.1997) (citing authorities). Moreover, the same witness is "subject to cross-examination" within the meaning of the rule. *Id.See also Owens,* 484 U.S. at 561–64, 108 S.Ct. 838; *Keeter,* 130 F.3d at 302.

*Affirmed.*

KING, Senior Judge, concurring:

With respect to the issue relating to the testimony of government witness Sandra Williams regarding the reason she was in fear, I am satisfied that the trial court did not err in allowing the testimony received in light of the prompt and strong limiting instruction given. I agree with the majority, however, that assuming it was error to admit that testimony, any error was harmless for the reasons stated by the majority. In all other respects, I join the opinion of the court.