*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 09-CF-687, 09-CF-772, 09-CF-773,
13-CO-1391, 13-CO-1392 & 13-CO-1393

AZARIAH ISRAEL & RONALD MARQUET CHEADLE, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-15431-07, FEL-1573-03 & CF1-20622-08)

(Hon. Frederick H. Weisberg, Trial Judge)

(Argued November 9, 2012            Decided November 26, 2014)

*Jonathan S. Zucker*, with whom *Patricia Daus* was on the briefs, for appellant Israel.

*Quin M. Sorenson,* with whom *David M. Schilling*, *Kristen Mann*, *David W. DeBruin, and Ishan K. Bhabha* were on the briefs, for appellant Cheadle.

*Sarah T. Chasson*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Roy W. McLeese III*, then Assistant United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *John P. Mannarino*, *Shana Fulton*, *Deborah L. Sines*, *Amanda Haines*, *Kathryn Rakoczy*, and *Peter S. Smith*, Assistant United States Attorneys, were on the briefs, for appellee.

Before WASHINGTON, *Chief Judge*, THOMPSON, *Associate Judge*, and PRYOR, *Senior Judge*.

THOMPSON, *Associate Judge*:   Following a seven-week jury trial, appellants Ronald Marquet Cheadle and Azariah Israel were convicted of murder, robbery, conspiracy, obstruction of justice, and weapons charges.[1]   After the trial court denied their motions for new trials, they filed these consolidated appeals, in which we consider claims that the trial court (1) erred in rejecting appellants' claim that African Americans were underrepresented in and systematically excluded from jury venires at the time appellants' petit jury was selected (the "fair cross-section claim"); (2) allowed improper rebuttal argument by the prosecutor; (3) improperly removed a juror during deliberations (the "juror removal claim"); (4) erroneously denied Israel's motion for a new trial after joinder was shown to have been prejudicial; and (5) erred in denying Cheadle's new-trial motion premised on a claim that the weight of the evidence did not support the jury's verdicts.

---

[1]   The jury found Cheadle guilty of first-degree murder while armed (felony murder) (Asheile George), premeditated first-degree murder while armed with aggravating circumstances (Elias Atkins), premeditated first-degree murder while armed (Pierre Johnson), armed robbery of Tamara Wilson, attempted robbery (of Asheile George) while armed, conspiracy to obstruct justice, obstruction of justice, five counts of possession of a firearm during a crime of violence or dangerous offense ("PFCV"), and carrying a pistol without a license ("CPWL").  The jury found Israel guilty of first-degree murder while armed (Pierre Johnson), conspiracy to obstruct justice, obstruction of justice, PFCV, and CPWL.

Following oral arguments before this court in November 2012, we remanded the cases for additional proceedings related to appellants' fair cross-section and juror removal claims. The Superior Court issued its Findings of Fact and Conclusions of Law on Remand in November 2013. Thereafter, the parties filed supplemental briefs as to both claims, completing the briefing on April 1, 2014. Having reviewed the trial court's supplemental findings and considered the arguments raised in appellants' initial and supplemental briefs, we now affirm the judgments of conviction and the denial of appellants' new-trial motions.

## I.    Background

The charges on which appellants were tried relate to the murders of Asheile George, Elias Atkins, and Pierre Johnson. The government alleged that the Atkins and Johnson murders were committed pursuant to a conspiracy to obstruct justice by silencing witnesses who might provide inculpatory testimony about Cheadle's role in the murder of George and then of Atkins.

### A.    The Asheile George Murder

The government presented evidence that, on September 14, 2002, Cheadle, Atkins, and Michael Craig committed an armed robbery and an attempted armed robbery in the 500 block of Kenyon Street, N.W. Government witnesses testified that the three men approached Kenyon Street driving in a van, confronted a group of men (including George) who were playing a game of craps on the street, and "stuck everybody up[,]" and that Atkins and another robber then crossed the street to rob another group of people who were sitting in a car. A gun battle ensued after one of the victims began to defend himself, and six people, including Cheadle and George, were shot. George eventually died of his wounds. Renee Beach, the mother of Cheadle's child, acknowledged at trial that she testified before the grand jury that Cheadle told her that he had been shot while walking to his car on Kenyon Street. The jury also heard the grand jury testimony of Cheadle's friend Michael Matthews, who testified that Cheadle told him that the injury occurred when Cheadle "went on a mission to rob somebody[.]"

### B. The Elias Atkins Murder

According to Michael Matthews's grand jury testimony, in the months following the Kenyon Street robbery, Cheadle became concerned about the possibility that Atkins "might tell." On March 11, 2003, six months after the

Kenyon Street incident, Cheadle and Matthews visited Atkins at the apartment of Arlene Morris, where Atkins was staying. During the visit, Cheadle, Matthews, and Atkins conferred in Morris's son's bedroom, while Morris was in another room. Morris testified that, shortly thereafter, she heard shots being fired in her son's room. She looked out into the hallway and saw Matthews fleeing from her son's room with nothing in his hands. After hearing more gunshots coming from her son's room, she hid in a closet, emerging later to find Atkins's body on the floor. Matthews told the grand jury that he saw Cheadle pull out a gun and ran out of the apartment after he heard a shot. Cheadle later told Matthews that he (Cheadle) shot Atkins again after Atkins ran out of the room and that Matthews should "say nothing" about the incident.

### C.    The Pierre Johnson Murder

On March 14, 2003, Cheadle was arrested for the Atkins murder and thereafter was housed in the same area of the D.C. Jail as his childhood friend Pierre Johnson. Appearing before a grand jury in May 2003, Johnson testified that, while he and Cheadle were incarcerated together, Cheadle confessed to killing Atkins. At approximately 1:30 a.m. on October 10, 2004, Johnson was shot and killed near the corner of 14th and V streets, N.W. George Haynes, another

childhood friend of Cheadle, testified that he was standing with some friends outside a gas station nearby when he saw Israel emerge from behind some cars wearing a mask that covered the lower portion of his face. Haynes testified that Johnson started to flee as soon as he spotted Israel, but that Israel fired five or six shots at the fleeing Johnson before running through an alley away from the scene. Haynes testified that he "understood that [Johnson] was going to get killed because he was telling" about Cheadle's involvement in the Atkins murder and that Israel had told him he was going to kill Johnson. Haynes further testified that, after Johnson had been killed, Israel approached Haynes and another man and asked them if they had seen "his work" and clarified that he was referring to the Johnson murder. About a week after Johnson was murdered, Israel told Haynes that men known as "Little MoMo" and "Little Clay" were also to be killed because they were "telling on" Cheadle for the Atkins murder.

### D.    Obstruction of Justice with Respect to Matthews

During the time period between the Atkins murder and the Johnson murder, while Cheadle and Johnson were still in jail together, Michael Matthews began cooperating with the government. On March 15, 2003, he gave a videotaped statement describing the Atkins shooting, and on March 17, 2003, he testified

before the grand jury. In May and June of 2004, Matthews visited Cheadle several times at the D.C. Jail and had conversations with Cheadle that were recorded by the jail. After those jail visits, Matthews went missing, failing to appear to testify in Cheadle's trial, which was scheduled to start in July of 2004 but had to be delayed after Matthews could not be found. At appellants' trial in 2009, Matthews claimed to have no memory of Atkins's murder even though he had given details about it to the grand jury.

## II. Analysis

### A. The Fair Cross-Section Claim

Cheadle filed a pre-trial motion in which he sought an opportunity for discovery on jury selection procedures, arguing that the District's jury selection process "systematically excludes and underrepresents African Americans in violation of both the United States Constitution and the District of Columbia Jury System Act." The trial court denied the motion, a ruling that both appellants challenged in their opening briefs on appeal. The government conceded in its brief that the trial court's summary denial of the motion was improper in light of this court's opinion in *Gause v. United States*, 6 A.3d 1247 (D.C. 2010) (en banc), and

agreed that the case should be remanded for the court to consider the scope of discovery to which appellants were entitled. Accordingly, in November 2012, we remanded the cases to the Superior Court with instructions to "consider and decide the scope of any discovery on jury-selection methods to which appellants are entitled, and . . . [to] entertain any motion appellant(s) may bring challenging the jury selection procedure used in connection with the trial[.]"

While the cases were on remand, and pursuant to the discovery motion, appellants received from the Superior Court Juror Office a spreadsheet containing self-reported race data for 344,241 potential jurors to whom summonses were sent between October 2008 and May 2010. Appellants also had the opportunity to interview Superior Court Juror Officer Suzanne Bailey-Jones. Thereafter, relying on an analysis by Howard University Professor of Economics Dr. Richard Seltzer, Cheadle moved for a new trial,[2] alleging that the jury-selection procedure used for his trial violated the Sixth Amendment and the Jury System Act because African Americans were underrepresented in jury venires at the time his petit jury was

---

[2] Although only Cheadle moved for a new trial, we granted Israel's request to join Cheadle's briefs on appeal. We therefore treat the fair cross-section claim as having been raised by both appellants.

selected in 2009.  In opposing the motion, the government relied on an analysis by statistician Dr. Bernard Siskin.

The experts proposed two benchmarks as points of comparison with the Juror Office data: (1) Figures from the 2010 Census (adjusted to exclude individuals under age eighteen), from which Dr. Seltzer estimated that African Americans comprised slightly more than 47.6 percent of the District's adult population in 2010 and Dr. Siskin estimated that the same group made up 48.89 percent of the District's adult population in that year; and (2) data from the 2005-2009 American Community Survey (an ongoing statistical survey prepared by the Census Bureau that gathers and publishes population information for non-census years), from which the experts estimated that 50.9 percent of the District's adult population was African American in 2009.[3]

---

[3]  The experts' reports do not discuss whether, as suggested in a law review article on which appellants' rely, a more appropriate "baseline for assessing demographic representation in the jury pool . . . is the jury-eligible population [which typically excludes, e.g., individuals who have felony convictions] rather than the total population."  Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must be Expanded*, 59 DRAKE L. REV. 761, 786 (2011).

Dr. Seltzer's analysis of the Juror Office data focused on the percentage of African Americans among the qualified potential jurors who actually reported for service ("the venires").[4] Dr. Seltzer found that, during the weeks between October 1, 2008 and February 2, 2009[5] — i.e., the weeks leading up to appellants' trial — an average of 37.3 percent of the qualified jurors who reported for duty were African American. Dr. Seltzer further found that, on the two days on which appellants' trial jury was selected — February 2 and 3, 2009 — 37.4 percent of the qualified jurors who reported for any venire were African American, and that, of the 128 jurors who made up the venires from which appellant's petit jury was selected, 38.6 percent were African American. When these statistics are compared to the 47.6 and 50.9 percent benchmarks Dr. Seltzer described, they suggest that African Americans were underrepresented among qualified jurors who reported for duty. Stated differently, Dr. Seltzer's data suggest that during the four months

---

[4] Except where noted, our references in the description that follows are to findings that reflect (1) the experts' use of a technique called "geocoding," which entails using zip codes to impute the races of venire persons who declined to self-report their race, and (2) a process whereby venire persons who were identified as "Hispanic" in Juror Office records were apportioned among other racial groups according to the percentages at which individuals who identified themselves as of Hispanic origin in the Census data identified themselves as belonging to those racial groups.

[5] These were the only weeks for the time period before appellants' trial for which data were provided.

immediately preceding February 2009, African Americans were underrepresented on the venires by over 10 percentage points (and by as much as 15.6 percentage points based on use of Dr. Seltzer's non-geocoding-adjusted estimate that only 35.3 percent of qualified reporting jurors during this period were African American).[6]

Dr. Siskin focused his analysis on the percentage of African Americans among individuals who were on the Master Jury Wheel (i.e., the list from which the Juror Office draws prospective jurors) and were sent summonses during the period covered by the Juror Office data. He found that African Americans constituted 53.4 percent of the 344,241 prospective jurors who were sent a summons between October 1, 2008, and May 27, 2010, and 50.2 percent of the 63,044 potential jurors who were sent a summons during the four-month period before appellants' trial, i.e., the period from October 1, 2008, to January 31, 2009. When these statistics are compared to the 48.89 percent and 50.9 percent benchmarks Dr. Siskin described, they suggest that African Americans may have been *over*represented, by between 2.5 and 4.5 percentage points, among those sent

---

[6] Dr. Seltzer's findings indicate that during the full twenty-month period covered by the Juror Office data, African Americans were underrepresented among qualified jurors who reported for duty by at least 8.4 percentage points and by as much as 12.9 percentage points.

summonses between October 1, 2008, and May 27, 2010, but may have been underrepresented, by as much as 1 percentage point, among those sent summonses during the four months preceding February 2009.

Dr. Siskin also calculated the representation of African Americans among the qualified jurors who reported for service, finding that, over the four-month period preceding February 2009, 37.5 percent of the qualified venirepersons who reported and were not selected as jurors — and 40 percent of those who were selected as jurors — were African American. He further found that over the full twenty-month period covered by the Juror Office data, 39.3 percent of the qualified venirepersons who reported and were not selected as jurors — and 41.7 percent of those who were selected as jurors — were African American. Compared to the 48.89 percent benchmark, the twenty-month data indicate underrepresentation by less than ten percentage points.[7]

In his November 2013 Findings of Fact and Conclusions of Law on Remand, Judge Weisberg rejected appellants' fair cross-section challenge, concluding that appellants had failed to show "that African Americans are

---

[7] Dr. Siskin also found that African Americans made up between 50 and 60 percent of appellants' actual trial jury (depending on whether geocoding is applied to impute the races of the four jurors who did not report their race).

underrepresented on the Master Jury Wheel relative to their number in the population at-large" and also did not show "that their claimed underrepresentation either on the Master Jury Wheel or in the pool of those who report[ed] for service is caused by systematic exclusion." Agreeing with the government that the relevant focus of analysis was not the representation of African Americans in the venires of prospective jurors who reported for service, but rather their representation on the Master Jury Wheel, Judge Weisberg first found that Cheadle had shown a non-existent or no more than *de minimis* — thus constitutionally insignificant — underrepresentation of African Americans on the Master Jury Wheel. Further, citing Dr. Siskin's finding that the alleged underrepresentation of African Americans in the pool of jurors who reported for service "dropped below 10% when [Dr. Siskin] looked at the entire twenty-month period for which data were available[,]" Judge Weisberg found it likely that the underrepresentation "was less than 10%, which most courts would consider undesirable, but not of constitutional significance."[8] He also found that, even accepting Cheadle's focus on the venires during the four-month period leading up to appellants' trial, Cheadle

---

[8] *See, e.g.*, *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir. 1985) ("this circuit has consistently found that a *prima facie* case of underrepresentation has not been made where the absolute disparity . . . does not exceed ten percent."); *see generally* Hannaford-Agor, *supra* note 3, at 767-68 ("Most courts that have adopted absolute disparity as the primary measure of underrepresentation have ruled that absolute disparities less than 10% are insufficient as a matter of law to demonstrate a violation of the fair cross section requirement.").

failed to show that any underrepresentation that did exist was the result of systematic exclusion of African Americans by the court rather than the result of "race-neutral economic and socioeconomic factors[.]"

Appellants argue that Judge Weisberg erred in accepting the government's argument that the relevant focus for measuring proportionate representation was the Master Jury Wheel rather than the venires from which petit juries were selected, and also erred by reasoning that the Superior Court's failure to take affirmative steps to remedy the underrepresentation of African Americans on the venires did not constitute "systematic exclusion" within the meaning of *Duren v. Missouri*, 439 U.S. 357 (1979).[9] Our review is *de novo*.[10]

---

[9] Appellants also argue that Judge Weisberg erred by relying on data drawn in part from the sixteen months that followed the selection of appellants' trial jury. We need not address this contention at any length because, as discussed *infra*, our disposition of the fair cross-section claim is based on appellants' failure to show systematic exclusion of African Americans in the jury-selection process rather than on differences between what the data show for the four-month pre-trial period and for the longer period covered by the Juror Office data. We do note, however, that at least in some circumstances, looking to data for a longer rather than a shorter time period may assist a defendant in demonstrating systematic exclusion. *See, e.g.*, *Duren*, 439 U.S. at 366 (petitioner's "undisputed demonstration that a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized").

Appellants also make a passing assertion on appeal, as they did in their trial motion, that the District's jury-selection practices violate the Jury System Act,

(continued…)

The Sixth Amendment to the U.S. Constitution establishes the fair cross-section requirement: It guarantees criminal defendants the "right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)). A defendant who alleges a violation of the Sixth Amendment's fair cross-section requirement bears the burden of showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of

---

(…continued)
D.C. Code § 11-1901 to 1918 (2012 Repl.) ("the Act"), which provides that "[a]ll litigants entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the residents of the District of Columbia." D.C. Code § 11-1901. Our case law establishes that "[t]he focal point for deciding whether [a jury-selection] system substantially complies with the requirements of the Act . . . is . . . the original source list from which names are selected for potential service." *Obregon v. United States*, 423 A.2d 200, 208-09 (D.C. 1980). Because appellants have failed to present any evidence regarding exclusion of African Americans from the lists used to compile the Master Jury Wheel, and because they have otherwise not explained their argument regarding the Act, we treat the argument as abandoned. *See Bardoff v. United States*, 628 A.2d 86, 90 n.8 (D.C. 1993) ("questions raised but not argued in briefing are treated as abandoned" (citing *Cratty v. United States*, 163 F.2d 844, 851 (D.C. Cir. 1947)).

[10] *See United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (explaining that a trial court's factual determinations relevant to a fair cross-section claim are reviewed for clear error while its legal determination of whether a *prima facie* violation of the fair cross section requirement has been shown is reviewed *de novo*).

this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364. "The fair-cross-section principle must have much leeway in application[,]" *Berghuis*, 559 U.S. at 321 (quoting *Taylor*, 419 U.S. at 537-38), and "neither *Duren* nor any other decision of th[e] Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools[.]" *Id.* at 331; *see also United States v. Rioux*, 97 F.3d 648, 657 (2d Cir. 1996) ("The relevant jury pool may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three. The time period may be defined as: (1) the day the district selected Rioux's jury pool; or (2) some broader timeframe, perhaps over the life of the wheel."). We think it plain, however, that a showing of constitutionally significant underrepresentation of a distinct group in *either* the Master Jury Wheel or the venires that were composed during a certain period can satisfy the second *Duren* prong. Further, a jury-selection mechanism that systematically operates to exclude a distinctive group from venires that are drawn from a representative master jury wheel would violate the Sixth Amendment guarantee no less than a system under which a distinctive group is systematically excluded from the master jury wheel. *See Taylor*, 419 U.S. at 538 ("[T]he jury wheels, pools of names, panels, or venires from which juries

are drawn must not systematically exclude distinctive groups in the community"). Therefore, it would have been error for Judge Weisberg to end his analysis upon concluding that African Americans were adequately represented on the Master Jury Wheel during the time period involved here.

Judge Weisberg did not end his analysis there, however; instead, he went on to consider the data showing an underrepresentation of African Americans among the jury venires during the four-month period before appellants' trial and information about the jury-selection system. For the reasons that follow, we discern no error in his conclusion that Cheadle failed to show that the underrepresentation was due to systematic exclusion of African Americans in the jury-selection process.

In addition to submitting to the court Dr. Seltzer's analysis of Juror Office data, Cheadle submitted a copy of the District's Jury Plan and information from the interview of Juror Officer Bailey-Jones. On the basis of those sources, he informed the court that when a prospective juror responds to a summons but fails to appear for duty, the Juror Office undertakes a series of measures designed to result in the prospective juror's service: First, the Juror Office sends a letter notifying the potential juror that he or she has missed the scheduled service and

prompting him or her to schedule another date to serve. If there is no response, the Juror Office sends a notice requiring the juror to appear and to "show cause" for the failure to report; and, if there is still no response, a bench warrant is issued and a criminal case is initiated against the absentee juror, who is typically assessed a fine of $25. In the case of a potential juror whose summons is returned as undeliverable, or a potential juror who both fails to return the summons and fails to appear for service, the Juror Office's practice is to take no further action, reasoning, in the words of Juror Officer Bailey-Jones, "[w]hy send good mail after bad?"

The expert reports that were before the court indicated that African Americans were overrepresented among those whose summonses were returned to the Juror Office as undeliverable, as well as among those who failed to respond to a summons for an unknown reason.[11] Appellants argued that evidence regarding the Juror Office's failure to take corrective action in response to the

---

[11] Dr. Seltzer found that African Americans constituted 58.9 percent of the potential jurors who did not respond to a summons for an unknown reason, and 49.1 percent of the potential jurors whose summonses were returned to the Juror Office as undeliverable. Using a geocoding methodology different from the one Dr. Seltzer employed, Dr. Siskin found that 64 percent of those who failed to respond to a summons for an unknown reason during this period were African American and that 52.2 percent of summonses that were returned as undeliverable over this period had been sent to African Americans.

disproportionately high rate at which African Americans failed to respond to jury summonses supported a conclusion that the underrepresentation of African Americans was "due to systemic exclusion of the group in the jury-selection process." In rejecting that argument, Judge Weisberg reasoned that "[t]he court can control to whom it sends jury summonses, but it cannot control who responds."

As we have explained, "a statistical showing alone, without some analysis of the particular system involved, is [in]sufficient to prove systematic exclusion." *Diggs v. United States*, 906 A.2d 290, 297-98 (D.C. 2006) (quoting *Obregon*, 423 A.2d at 206) (rejecting argument that the third *Duren* prong was satisfied "by merely showing that a high comparative disparity existed over a long period of time and that the underrepresentation probably did not happen by chance"). Although both parties presented statistical documentation of the less-than-satisfactory representation of African Americans on jury venires over the period studied, no evidence was presented to show that this was the result of any policy or practice that could be deemed to constitute systematic exclusion of African Americans from jury service within the meaning of *Duren* (or, analogous to the facts of *Duren*,[12] a system-sanctioned opportunity for African Americans to

---

[12] In *Duren*, the Supreme Court considered Missouri procedures that allowed women to remove their names from the master jury wheel and to opt out
(continued…)

exclude themselves from jury service).[13]  The underrepresentation of African Americans appears to be attributable to external factors — undeliverable mail or the choices of individual prospective jurors not to respond to their summonses or not to appear for service — not to systematic exclusion existing in the jury-selection process.  *Cf. Orange*, 447 F.3d at 800 ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*."); *Rioux*, 97 F.3d at 658 ("There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces.  The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes.").  Further, appellants presented no evidence that

---

 (…continued)

of jury service upon receipt of a summons.  *See* 439 U.S. at 361-62, 362 n.14.  The result of those procedures, which the Court held were unconstitutional, was that the percentage of women in the jury pool was reduced from 26.7% (of the master jury wheel) to approximately 15% of the venire from which Duren's jury was selected.  *Id.* at 365-67.

[13]  Nor have appellants claimed that the Superior Court's policies "made social or economic factors relevant to whether a[] . . . juror would be excused from service[.]"  Hannaford-Agor, *supra* note 3, at 776-77 (referring to *People v. Smith*, 615 N.W.2d 1, 12-13 (Mich. 2000), involving a juror-excusal policy that "routinely granted excusal requests for hardship due to loss of income, lack of transportation, and lack of childcare, which disproportionately released African-Americans from jury service").

the Juror Office's policies and practices in any other way encouraged African Americans to avoid or to be absent from jury service.

Appellants suggest a number of steps that the Juror Office might have taken to address the underrepresentation of African Americans in juror venires. For example, they note that some jurisdictions have adopted a practice of responding to each summons returned as undeliverable by mailing a summons to an additional resident from the same neighborhood or zip code.[14] That and other measures used by other jurisdictions may well deserve the attention of our Juror Office, but we cannot say that they are constitutionally required. Indeed, as the Second Circuit noted in *Rioux*, 97 F.3d at 659, such a targeting might well be objectionable "since it would undermine the randomness of selection—an attribute of jury selection that is keenly desired." In addition, without knowing how the source lists that those jurisdictions draw on for the pool of prospective jurors compare to the wide range of sources used in our jurisdiction,[15] we have no basis for concluding that

---

[14] *See Courts Try to Maximize Jury Diversity*, The Third Branch (July 2007), *available at* http://www.uscourts.gov/news/TheThirdBranch/07-07-01/Courts_Try_to_Maximize_Jury_Diversity.aspx (last visited November 20, 2014).

[15] Section 2 of the Jury Plan for the Superior Court of the District of Columbia specifies the lists from which the Master Jury Wheel is created: the list of voters registered in the District of Columbia; the list of drivers, eighteen years or

(continued…)

corrective measures of the type they employ are equally needed or appropriate here.

## B.    The Prosecutor's Rebuttal Argument

Israel's claim relating to the prosecutor's rebuttal argument is based in part on comments the prosecutor made when discussing the testimony by Henrietta Taylor, Pierre Johnson's mother. The prosecutor said:

> She wouldn't even look at [appellants]. Can you identify them? She wouldn't look over at them. . . . Why is it, ladies and gentlemen, that every single witness that came here in front of you came kicking and screaming?

Continuing, the prosecutor said:

> What is it about Columbia Heights, whether it's up on Clifton, W, or . . . V Street, what is it about what happens

---

(…continued)
older, licensed in the District; the list of residents of the District, eighteen years or older, who have received a non-driver's identification card from the District; the most recent list of individuals to whom District personal income tax forms have been sent by the D.C. Department of Finance and Revenue, as well as the most recent list of individuals who have filed personal income tax forms in the District; the most recent list of individuals who have qualified to receive any type of public assistance benefits in the District; the most recent list of persons who have become naturalized citizens in the District since the previous master jury list was created; and "such other source lists as may become available."

> to snitches on this witness stand? . . . Why is it so hard to say, yeah, yeah, I saw him do it; yeah, he did it; yeah, that was him over there? Why is it that not one person — risking arrest, risking careers, why do they all have to be in here, bound, dragged in, under arrest, all of them, why? . . . On this evidence, ladies and gentlemen, on this evidence, nobody wants to be a witness. Nobody gains anything from falsely accusing Marquette Cheadle or Azariah Israel. Now, think about that. It's bad enough, using your common sense, if you snitch, if you tell, if you look either one of them in the eyes and say, yeah, I saw what you did, I heard what you said. That's bad enough.
>
> Now, imagine putting yourself in a position where — say, oh I killed [Atkins], and I get up and tell everybody [Cheadle] did it. Or I killed [Pierre Johnson]. And I tell everybody, [Israel] did it. What possible — what — what are these folks going to gain? That's a death sentence. . . . We submit there's no reason for anybody to falsely accuse either Mr. Cheadle or Mr. Israel of these crimes.

Israel asserts that it plainly was not true that every witness came in "kicking and screaming,"[16] and that the "clear implication" of the prosecutor's remarks was that

---

[16] As Israel notes, despite the prosecutor's rhetorical flourish, many witnesses, including the various police officers, Assistant United States Attorneys, and medical and forensic experts, had no apparent reluctance to testify.

Israel's opening brief acknowledges, however, that several of the government's witnesses "refused to answer questions at trial by claiming a lack of memory of the events they witnessed and [had] testified about before the grand jury. All tried to avoid testifying[,] and all had material witness warrants issued to secure their appearance." As the government's brief summarizes, two witnesses to the Kenyon Street robbery had to be arrested to procure their testimony; another

(continued…)

Taylor and certain other witnesses were reluctant to testify because they feared appellants, even though there was no evidentiary basis for such argument. Citing *Murray v. United States*, 855 A.2d 1126 (D.C. 2004), Israel argues that the prosecutor's remarks were improper and were designed to arouse the passion of jurors, and that the trial court erred by allowing the remarks. *See id.* at 1132 ("evidence concerning a witness' fear tends to be extremely prejudicial" because it "suggests the witness fears reprisal at the hands of the defendant or his associates if she testifies.") (internal quotation marks and alterations omitted).

It is true that, because of the risk of unfair prejudice to defendants, "argument by prosecutors about witness fear—especially fear of the defendants on trial—must be the limited exception rather than the rule." *Murray*, 855 A.2d at 1133. However, while an argument that a witness fears reprisal from the defendant(s) is highly prejudicial, we have also held that questioning or argument about a witness's generalized fear of reprisal from his community for violating norms against testifying in criminal cases is permissible. *Carter v. United States*,

(…continued)
witness to the Kenyon Street robbery testified evasively; Atkins's girlfriend falsely claimed to be in Miami and came to court only after a detective threatened to obtain a warrant for her arrest; Matthews claimed on the witness stand that he had no memory of Atkins's murder even though he gave details about it to the grand jury; and Morris had an "equally spectacular failure of memory[.]"

614 A.2d 913, 917-18 (D.C. 1992) (distinguishing between prosecutorial questions that insinuate that the defendant was intimidating the witness, which have a strong prejudicial effect, and questions that suggest that "other people" "on the street" might intimidate the witness, which generally do not give rise to unfair prejudice sufficient to undermine the basic fairness of the proceeding); *see also Clayborne v. United States*, 751 A.2d 956, 964 (D.C. 2000) (allowing cross-examination about witness's fear of "be[ing] known as a snitch").

In this case, we are not persuaded that the prosecutor's comments were inappropriate.[17] "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). It is far from apparent that jurors would have understood the prosecutor's "kicking and screaming" remarks to suggest that the various witnesses' reluctance to testify

---

[17] *See Carpenter v. United States*, 635 A.2d 1289, 1295 (D.C. 1993) (explaining that, in evaluating a claim of trial court error, we must first determine the prosecutor's comments constituted misconduct) (citing *Hammill v. United States*, 498 A.2d 551, 554 (D.C. 1985)).

was the result of their fear of reprisal by Israel.[18]  To the contrary, in the context of the prosecutor's references to Columbia Heights and Clifton, W, and V Streets, the prosecutor's "kicking and screaming" remarks appear to have been a reference to the community ethos against "snitching" or cooperating with the government.  So understood, the prosecutor's remarks told the jury why it should credit the secret grand jury testimony of a reluctant witness such as Morris rather than her public trial testimony in which she claimed not to remember anything about the night when Atkins was shot.  The prosecutor's reference to a "death sentence" appears to have been an argument that while truthful snitching was frowned upon, false snitching — i.e., falsely accusing the defendants — would be to invite the most severe community scorn.   The comment was a permissible way of rehabilitating witnesses whose credibility the defense lawyers had attacked through suggestions that the witnesses' earlier inculpatory statements were fabricated,[19] because it suggested that the jury had a reasonable basis for regarding such witnesses' inculpatory testimony as *more* rather than less credible.

---

[18]  The prosecutor's remarks in this case are unlike those in *Murray*, in which the prosecutor "went astray" in mentioning that "these people were scared" because they "know that [the defendants] went out in the street . . . to retrieve their gun" and were "willing . . . to abduct a person at gunpoint."  *See* 855 A.2d at 1133.

[19]  For example, Cheadle's trial counsel argued that Matthews's grand jury testimony was an attempt to frame Cheadle for the murder of Atkins.

## C.     The Juror Removal Claim


### 1.  Background


The case was submitted to the jury at about 4:15 p.m. on Monday, March 23, 2009.  On the morning of Tuesday, March 24, Judge Weisberg received a note, signed by the jury foreperson, stating that one juror, who was later identified as Juror 13, had a "family emergency and will be unable to be here Monday or Tuesday, the 30th and the 31st" and that "[o]ur sense is that it would be advisable to contact the alternate."  Upon coming into the courtroom to discuss her situation with the judge, Juror 13 said that she would not have a problem if (as the court had suggested might occur) the jury would not be deliberating on Friday.

About two and a half hours later, Judge Weisberg received another note signed by the foreperson that read:

> Judge, we have a problem.  One of the jurors has said [crossing out the word "announced"] that her mind is closed as to the case.  Our deliberations are unproductive already.  All eleven jurors are in agreement on this point.

Judge Weisberg consulted with the prosecutor and defense counsel. The court expressed concern that the juror described in the note might again be Juror 13, about whom the prosecutor had raised concerns during the presentation of evidence. The prosecutor had earlier reported observing the juror shaking her head disapprovingly at court rulings and during the questioning of some witnesses; failing to follow the written transcripts during playbacks of recorded phone calls; speaking out loud and talking to herself while the calls were being played; appearing to sleep during portions of the trial; and casting her eyes up to the ceiling and "clearly not listening" during closing arguments and the court's instructions. The juror had also loudly commented that the number of security personnel in the courtroom was "ridiculous" and unnecessary.

Both defense counsel argued that, regardless of the identity of the juror, an instruction to the jury to continue deliberations and a renewed instruction to deliberate in good faith would be adequate curative measures. Judge Weisberg commented that if the juror who was the subject of the foreperson's note was the same juror about whom the prosecutor had raised concerns, he would be inclined to dismiss that juror without additional instruction because, "after the concerns were expressed about this juror's attitude toward her juror service," he had already

instructed the jury three times on the importance of deliberating with an open mind,[20] and was skeptical that a fourth instruction would have "a salutary effect[.]"

Judge Weisberg also told counsel that he was "concerned because it happened so quickly in the deliberations after such a lengthy trial," and because

---

[20] First, Judge Weisberg had instructed the jury that

> [I]f you go into the jury room . . . with your mind already firmly made up, it kind of defeats the whole purpose of deliberations, which is to talk about it for the first time freely and openly, among yourselves, [and] if there are disagreements, to talk about the disagreements respectfully with each other, to see why somebody may see it differently than the way you see it. And so, it's very important that you go into that process with a completely open mind. So don't try to make up your mind about anything in the case any stage, including this late stage.

On the following day, Judge Weisberg instructed the jury further that

> [I]t's very important that when you go into deliberations, you haven't made up your own minds firmly about any aspect of the case, until you have a chance to talk to each other about it. That's the whole point of deliberations.

The next day, Judge Weisberg instructed jurors that they should

> [t]ry to retain everything you've heard, but please, as I've told you last night, don't try to make up your mind. It's unfair to the parties. It's unfair to yourselves to go into your deliberations . . . with a mind already firmly made up. You should keep a completely open mind until you begin your deliberations.

"an unwillingness to deliberate further at such an early stage . . . suggests . . . that it's a closed mind, . . . not a dissenting mind[.]" He reasoned that the jury had not had "a chance to get far enough to know whether there's a dissent or disagreement about the merits of the case" and that there appeared to be "just a closed mind and a refusal to even listen to the point of view of others." He explained that if the note was about Juror 13, he would have to view the note "in the context of the entire trial[,] beginning with her response on voir dire where I was commiserating with the venire about the length of the trial and her response was, the longer the trial, the better, I hate my job anyway." Responding to defense counsel's suggestions that without an additional instruction, the court would not be in the position of having "tried to address it and concluded that that has failed[,]" Judge Weisberg said, "I would say that's true of any other juror, [but] I'm not as sanguine about this one."

Judge Weisberg decided to question the foreperson about the note using language taken from *Brown v. United States*,[21] explicitly recognizing that the situation was "extremely dicey" and that he needed to be "quite careful" in his inquiry. The foreperson confirmed that the juror referred to in the foreperson's note was indeed Juror 13. The foreperson told the court that Juror 13 had

---

[21] 818 A.2d 179 (D.C. 2003).

announced on the evening of March 23, "before deliberations had begun[,]" "that there was going to be disagreement. Apropos of nothing said there would be disagreement." The foreperson further explained that at the very beginning of deliberations on the morning of March 24, when the foreman began expressing his views on the case and before anyone else had spoken, Juror 13 "stood up, walked out of the room or started to walk out of the room, because she was afraid of a scheduling conflict and said, we're going to be here through the weekend and into Monday and Tuesday." In addition, the foreperson told Judge Weisberg the following:

> [A]s we talked over the course of the day and more extensively about the case, [Juror 13] said repeatedly that nothing anybody said could persuade her one way or the other. Um, that her mind was made up. Um, she also at times said, oh, I'll listen, I'll listen, I'll listen. She would say at times, I'll listen, okay, but it was the unanimous view of the eleven jurors in the room that [Juror 13's professions of willingness to deliberate] were not sincere.

Asked by Judge Weisberg how he knew that, the foreperson replied that, after the lunch break,

> We had come in and we were speaking about the case, things became more — rather heated, not terribly so, [Juror 13], in the middle of — really somebody else talking, stood up and said, can I go to the bathroom outside of the jury room? And nobody was going to stop her. It wasn't a break, so she walked out[.]

The foreperson continued:

> And I should emphasize that there's a lot of disagreements in the jury room . . . [T]here are disagreements between people that are not this juror and that are being handled in an . . . upright and thoughtful fashion. . . . [T]his [i.e., the situation with Juror 13] is something very different.

The foreperson acknowledged that Juror 13 was (in Judge Weisberg's words) "going over [the] evidence and what it shows," but added that Juror 13 "emphasizes her conclusions — significantly more than the evidence in the case." Asked by Judge Weisberg whether he took Juror 13's comments to mean "I have made up my mind and I will not be open to further deliberations, and won't discuss it further" or instead to mean, "I'm willing to listen but it's going to take a lot to change my mind on my view of the case[,]" the foreperson responded,

> Significantly closer to the former. She expresses formally those words. She does not listen. She puts her head down and closes her eyes. Um, is combative, accuses people of having agendas.

From the foreperson's answers, Judge Weisberg concluded that "from his expression of it, her mind is completely closed, was closed before they started, will not be reopened no matter what[.]" He also told counsel that he didn't "think it's

so far in the deliberations that we [could] single [Juror 13] out as a dissenting juror on the merits because, as [the foreperson] expressed himself, there's lots of disagreements going on the merits, among the others." He also observed that he had "enough basis to conclude that an instruction would be very unlikely to be productive."

Judge Weisberg next questioned each of the jurors, telling them that he was not "asking any juror what their . . . view of the case is, or what views have been expressed in the jury room." He asked each juror (except Juror 13), "Do you believe that one or more jurors went into deliberations with a closed mind and he or she is unwilling to consider the views of others and possibly changing his mind" and whether the juror's answer was "based on expressions by that juror[.]" Each juror confirmed that that was his or her belief and basis for belief. When Juror 13 herself came in for questioning and Judge Weisberg informed her that other jurors believed that she had "entered into the deliberations with [her] mind already made up[,]" she responded by saying:

> No, that's not true. I was not in agreement with them, so they tried to force me to be in agreement with them. . . . I was standing on the evidence that was there and they tried to force me to agree with them by hollering and becoming belligerent, and I told them that I made up my mind with the decision that I made and they cannot force me to agree with them, no matter how many ways they

tried to tell it to me. I'm a very smart educated woman. I have degrees and everything. You cannot force me to agree with you for something that I don't believe in standing on the evidence that is presented there. So they were very upset about that.

 . . . .

That's the overall problem. They can't force me to agree with them.

 . . . .

I'm here to do the job of the juror. And that is to base the facts on the actual evidence.

At the conclusion of the *voir dire*, Judge Weisberg decided to remove Juror 13 and replace her with an alternate pursuant to Super. Ct. Crim. R. 24 (c). He explained his decision as follows:

> [E]leven others say somebody has a closed mind, entered the deliberations with a closed mind and is refusing to deliberate with an open mind . . . . [I]t's as clear as it could possibly be, that leaving this juror on the jury whatever any of their views are about the merits of the case, including her, is not conducive to a jury that can fulfill its oath and perform its duty to deliberate based solely on the evidence and the law of and the facts of the case.

Judge Weisberg added:

> [I]f we were in the fifth day of deliberations, and they had thoroughly discussed the case with [Juror 13]

participating, and she had a view that was different from all the others and said they just don't agree with me and they can't force me to change my mind, we wouldn't be in this discussion.

She'd be on the jury. . . . [But] [s]he went into the jury room with a closed mind, expressed it last night before they even began talking about the case, reinforced it this morning, saying, I'll listen, but my mind is made up, and all eleven other jurors have confirmed what the foreperson told us. And I think that's just not conducive to . . . the type of deliberations [to] which all parties in this case are entitled.

After the removal of Juror 13 and substitution of an alternate juror, the jury deliberated for approximately three days before reaching its verdicts.[22]

Following announcement of the verdicts, appellants sought new trials on the ground that there was no "'just cause'" to remove Juror 13. In its opposition, the government disagreed and also asserted that its subsequent investigation had revealed that Juror 13, a Maryland resident, had not been qualified to serve as a juror to begin with. Judge Weisberg denied appellants' motion, specifying that his ruling was based "solely on the record as it existed at the time" of removal, but noting that the subsequently discovered information about Juror 13's

---

[22] Judge Weisberg later told counsel that he was "pleased that we were able to get through that very difficult inquiry without any juror telling us where she or any other jurors stood based on the one day of what I would call non-deliberations or partial deliberations with eleven people participating and one not."

misrepresentation of her eligibility "corroborate[d] the court's assessment of her lack of credibility."[23]

In their initial briefs on appeal, appellants argued that Judge Weisberg erred in denying their motion for a new trial because the removal of Juror 13 violated both Super. Ct. Crim. R. 24 (c) and their constitutional rights to an impartial and unanimous jury. Following oral arguments before this court in November 2012, we remanded the case and instructed the trial court to make additional findings of fact regarding whether "during jury selection, the removed juror failed to disclose disqualifying information out of 'a desire to serve on [the] jury for some improper purpose,' *Young v. United States*, 694 A.2d 891, 894 (D.C. 1997), and whether she otherwise was biased against the government." After remand proceedings that included a July 2013 evidentiary hearing (at which Juror 13, Michelle Suggs, testified), Judge Weisberg found that during *voir dire* Juror 13 "intentionally lied about her [non-District of Columbia] residence," "failed to disclose her 2007 misdemeanor conviction," and "failed to disclose her close personal or family

---

[23]  Judge Weisberg later commented that the "dishonesty and potential fraud unearthed by the government after the trial and brought out at the hearing on remand" "reinforce[d] [his] view that [Juror 13] is a person with little regard for the truth if it stands in the way of getting what she wants."

relationship with a convicted felon, which may have been intentional."[24]  However, while finding that "[t]he inference is compelling that [Juror 13] did all of these things because she wanted to serve on a jury in the District of Columbia" and that "[t]here is enough in the record to surmise" that this desire arose from an anti-prosecution bias, Judge Weisberg concluded that the government had not proven "by a preponderance of the evidence that [Juror 13's] motive for wanting to serve on defendants' jury was to acquit the defendants or hang the jury because of her bias against the government."

## 2. Analysis

Super. Ct. Crim. R. 24 (c) provides in pertinent part that "[a]n alternate juror, in the order called, shall replace a juror who, becomes or is found to be unable or disqualified to perform juror duties."  The Rule limits the discretion of the trial judge in removing and replacing a juror in order to safeguard the defendant's "valued right to have his trial completed by a particular tribunal," a

---

[24]  The government submitted evidence that Juror 13 had not lived in the District of Columbia since at least 2006 and had failed to disclose a 2007 conviction for driving under the influence.  The government also presented evidence that Juror 13 had failed to disclose a close relationship with a man named Wendell Clay, who was convicted of first-degree burglary in 1998, served a twelve-year sentence, lived with Juror 13 in Maryland between his release in 2009 and his arrest on another charge in 2010, and listed Juror 13 on prison visitation forms as, variously, his spouse or his aunt.

right that is rooted in the constitutional rights to an impartial jury and a unanimous verdict and in the guarantee against double jeopardy. *Hinton v. United States*, 979 A.2d 663, 674-75, 681-82, 682 n.76, 688-89 (D.C. 2009) (en banc) (internal quotation marks omitted).[25] "It is well-settled that each of those rights 'would be abrogated if it were permissible for the judge to intervene in deliberations and remove a juror for dissenting from the majority view.'" *Id.* at 682; *see also id.* at 685 ("[R]emoving a juror because of his views of the evidence [is] one of the principal evils against which Rule 24 (c)'s restrictions are directed."); *Shotikare v. United States*, 779 A.2d 335, 344 (D.C. 2001) ("[A] juror may not be excused for the purpose of breaking a deadlock or because of her views on the merits.").

We review a trial court's decision to replace a juror with an alternate for abuse of discretion. *Darab v. United States*, 623 A.2d 127, 138 (D.C. 1993). A court abuses its discretion in replacing a juror under Rule 24 (c) "if it replaced the juror for an improper or legally insufficient reason, if its ruling lacked 'a firm factual foundation,' or if the trial court otherwise failed to 'exercise its judgment in a rational and informed manner.'" *Hinton*, 979 A.2d at 683-84 (internal citations

---

[25] *See also Hobbs v. United States*, 18 A.3d 796, 800 (D.C. 2011) (noting that *Hinton* "described a far more limited scope for the trial court's exercise of discretion in ruling on motions for excusal of empaneled jurors," such that "[o]nce jeopardy attaches and jurors begin their duties, they can no longer be removed for reasons that would meet only the good cause standard").

omitted). We will reverse an appellant's conviction "if the record evidence discloses any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case[.]" *Shotikare*, 779 A.2d at 345; *see also United States v. Brown*, 823 F.2d 591, 597 (D.C. Cir. 1987) ("Because the record evidence in this case discloses just such a possibility, we must reverse the convictions.").

Appellants argue that Judge Weisberg lacked a sufficient factual basis for a finding that Juror 13 was, as Rule 24 (c) requires for removal, "'unable' to perform her [juror] duties[.]" They assert that there was at least a reasonable possibility that the other jurors' difficulties with Juror 13 and their assessment of her willingness to deliberate related to their disagreement with her views on the merits of the case. Accordingly, appellants argue, Judge Weisberg's decision to remove Juror 13 violated their rights to a unanimous and impartial jury and to a fair and neutral tribunal. We disagree.

Appellants do not dispute that "[e]vidence of a juror's . . . seriously disruptive behavior" can be adequate to support a finding of incapacity to serve under Rule 24 (c) and can thus be a "legally sufficient basis" for removing a

juror.[26]  That is precisely what the foreperson's answers described and what Judge Weisberg found to exist.[27]  According to the foreperson, Juror 13 twice stood up and walked out of the jury room while other jurors were expressing their views (the first time, when the foreperson began to describe his initial take on the case and Juror 13 stood up and left or attempted to leave to address her scheduling issue; and the second time when the jury had just reconvened after the lunch break and another juror began speaking, and Juror 13 stood up and walked out to go to a bathroom outside the jury room).  Each time, she interrupted the jury's efforts to deliberate.  Even when she remained within the jury room, she put her head down and closed her eyes rather than engage with her fellow jurors.  She expressed to them that her mind was made up and that while she would listen, nothing they could say could change her mind.  According to the foreperson, what Juror 13 expressed was something close to "I have made up my mind and I will not be open to further deliberations, and won't discuss it further[.]"  We are satisfied that Judge Weisberg had a sufficient basis for finding that, in all these ways, Juror 13 was not deliberating and was disrupting her fellow jurors' efforts to deliberate and

---

[26]  *Hinton*, 979 A.2d at 684 n.90 ("Evidence of a juror's . . . seriously disruptive behavior is certainly adequate reason to conclude [that the juror lacked capacity to continue to serve as a juror].").

[27]  *See Shotikare*, 779 A.2d at 340 (holding that the judge properly excused a juror for "intimidating the jury and disrupting its deliberations.").

rendering those efforts (as the foreperson described) "unproductive." *Cf. Hinton*, 979 A.2d at 680 ("[W]e think a trial court appropriately may find an empaneled juror 'unable or disqualified to perform juror duties' . . . where the court perceives a serious risk that the juror's ability to deliberate fully and fairly will be compromised . . . .").

Judge Weisberg also had an adequate basis for finding that Juror 13 entered deliberations with a closed mind and an intent to cause the jury's work to be protracted and unproductive. Before discussions had begun, she predicted "disagreements" that would cause the jury still to be deliberating a week later,[28] possibly because of her "the longer, the better" sentiment. Necessarily, to avoid intruding into the jury's deliberations, "the record that [was] generated in the course of the [court's] inquiry [was] less than exhaustive[,]" *Shotikare*, 779 A.2d at 345, but Judge Weisberg was entitled to credit the foreperson's stated impression, and the other jurors' agreement, that Juror 13 expressed that her mind was closed as to the case and said repeatedly that "nothing anybody said could persuade her

---

[28] Notably, the foreperson's report of Juror 13's concern about her conflicting travel plans on March 30 and 31 prompted Cheadle's counsel to comment that it was "a little premature [for Juror 13] to conclude that [the jury] won't have a decision by then."

*one way or the other*" (emphasis added). Judge Weisberg's assessment was that Juror 13 lacked credibility, and he was entitled to discredit her claim that she was merely "standing on the evidence."[29] We have no basis for second-guessing Judge Weisberg's assessment that comments such as those Juror 13 made right off the bat after a lengthy trial on multiple charges evinced a closed mind and a refusal to listen to others' points of view — an impediment to deliberations going forward[30] — rather than a conscientiously dissenting mind.[31]

---

[29] *See Brown*, 818 A.2d at 186 ("[T]he judge was not obliged to accept [the removed juror's answer] at face value."); *Shotikare*, 779 A.2d at 347 ("[A] juror's assurance that he or she can render a fair and impartial verdict is not dispositive.") (internal quotation marks omitted).

[30] As Judge Weisberg put it, "if you can't listen to each other's point of view, deliberations just can't occur."

[31] *Cf. Brown*, 818 A.2d at 187 (noting that where the trial court "credited the broad consensus among the jurors that Juror Three had refused to participate in the deliberation process from the beginning[,]" this finding would be reviewed for clear error, since the court was uniquely situated to make the credibility determinations that must be made where a juror's motivations and intentions are at issue); *United States v. Baker*, 262 F.3d 124, 130 (2d Cir. 2001) ("A [trial] court's finding on the question whether a juror has impermissibly refused to participate in the deliberation process is a finding of fact to which appropriate deference is due."); *see also Hinton*, 979 A.2d at 683-84 (recognizing "the trial judge's superior ability to observe the demeanor of the juror" and stating that it is not this court's "function . . . to second-guess a reasonable judgment of the trial court") (internal quotation marks omitted); *Braxton v. United States*, 852 A.2d 941, 949 (D.C. 2004) ("[E]ven though the evidence of juror misconduct was less than overwhelming, it was sufficient to preclude us from second-guessing the trial judge's finding. . . ."); *Shotikare*, 779 A.2d at 345 (noting that "the questioning of the jurors supported the judge's factual findings concerning [the removed juror's]

(continued…)

Nor can we agree on this record that there is a reasonable possibility that Juror 13 was removed because she was a dissenting voice or because of her views on the evidence, such that her removal violated appellants' Fifth and Sixth Amendment rights.[32] We deem it important, as Judge Weisberg did, that the issue of Juror 13 came to light early after the case had gone to the jury, when there were still what the foreperson described as "lots" of disagreements among the jurors, meaning that no juror could be identified as a dissenter.[33] Notably, too, following

_____

(…continued)

behavior" and "defer[ring] to the judge's findings, particularly inasmuch as they turned, in part, on his evaluation of the jurors' demeanors").

[32] *Cf. United States v. Symington*, 195 F.3d 1080, 1087 n.5 (9th Cir. 1999) ("We emphasize that the standard is any reasonable possibility, not any possibility whatever.").

[33] Citing *Symington*, appellants argue that, since it is unlikely that the other jurors would have suggested the removal of Juror 13 if she had agreed with their views on the merits, the very fact that they sought intervention from Judge Weisberg gave rise to a reasonable possibility that the removal of Juror 13 was motivated by her views on the merits. However, this case is readily distinguishable from *Symington*. In *Symington*, there was "considerable evidence to suggest that the other jurors' frustrations with [the removed juror] derived primarily from the fact that she held a position opposite to theirs on the merits of the case[,]" and the Ninth Circuit noted that individual jurors asked the district court "to dismiss [the removed juror] because otherwise the result would be 'an undecided vote, a hung jury[]'" and because "'we are blocked and blocked and blocked [and] don't want to be blocked any more.'" 195 F.3d at 1088. Moreover, the jury note was sent when the jury had been deliberating for a week. *Id.* at 1083. There was no similar communication in this case, and the jury had had the case for only a few hours.

(continued…)

the replacement of Juror 13, deliberations continued for a further three days before the jury reached its verdicts, suggesting that there remained much room for discussion at the time Juror 13 was removed.[34]

Appellants also argue that "the decision to remove [Juror 13] . . . entail[ed] influencing the outcome of deliberations in a known direction." *Braxton*, 852 A.2d at 947 (internal quotation marks omitted). It is true that, even though Judge Weisberg scrupulously avoided any indication of the jurors' views on the merits of the case and explicitly and repeatedly admonished each juror that they should reveal nothing to him about the content of their deliberations, Juror 13's demeanor during the presentation of evidence seemed to reveal that she had some hostility to

---

(…continued)

[34] We also note that, as in *Shotikare*, the court "took pains" to let the remaining members of the jury know that the juror's removal "had nothing to do with her views on the merits." 779 A.2d at 346. Judge Weisberg reminded the jurors that he did not know and "never w[ould]" know "anything about what you've talked about the case[,]" and explained that Juror 13 had been excused because "the process couldn't even get started because somebody went into the process with their mind made up, [such] that it became impossible for the others to persuade or to talk about[,] in a meaningful way, any differences that may exist in your deliberations." Judge Weisberg also told the remaining jurors that if, by contrast, deliberations had been going on for days and "a juror came in and said I just disagree with them," he would not have been able to do anything about that, because it "sometimes happens" that "we can't get a verdict[.]"

the government.[35]  However, here, as in *Baker* (where the removed juror had told the trial judge that she felt the defendants had been "unfairly prosecuted"), the juror "was not removed for her nonconforming view of the evidence[,]" but "was removed for her . . . refusal to perform her duty as a juror by deliberating together with the other jurors"; and "[t]he complaints of the other jurors, although including reference to [the removed juror's] statement that 'the evidence was not going to change her mind,' focused on her 'refusal to deliberate on any of the counts.'"  262 F.3d at 131-32 (holding that the trial court was within its discretion in removing the juror).  *See also Shotikare*, 779 A.2d at 345-46 ("It was known, of course, that Juror # 5 was in disagreement with at least some of her fellow jurors. The jury had reported itself deadlocked, and it reasonably could be surmised that Juror # 5 contributed to the logjam. . . . However that may be, the deadlock was not the impetus for Juror # 5's removal.  More precisely, we may say that there is no reasonable possibility apparent on the record before us that Juror # 5 was dismissed, or that her dismissal was sought, for the purpose of undoing the deadlock, or because of her views on the merits.").

---

[35]  We note that, in support of his new-trial motion, Cheadle attached a declaration from Juror 13 in which she made her views as to the merits known for the first time, stating that she "did not find that the evidence in this case proved that the defendants were guilty" and that she specifically disbelieved the testimony of George Haynes because he was cooperating with the prosecution.

Finally, we turn to appellants' argument that the Rule 24 (c) "incapacity" standard incorporates a requirement that a juror be shown not merely to have failed to deliberate at one point in time, but to have repeatedly failed to heed remedial measures (such that the trial court can conclude that the juror not only has been unwilling to deliberate, but is not able to do so prospectively). *Cf. Braxton*, 852 A.2d at 948-49 ("reluctan[tly]" concluding that there was no error in removal of juror where the foreperson's reports of misconduct occurred after "a forceful reinstruction of the jury[,]" "suggest[ing] that the judge's directive fell on one pair of deaf ears[,]" and where there thus was "substantial record support for the judge's finding that a juror was not carrying out her responsibilities appropriately"). We agree that seeing how a non-deliberating juror conducts herself after a re-instruction can move a trial court closer to a firm factual foundation about the juror's capacity going forward. However, Rule 24 (c) imposes no explicit "exhaustion of alternative remedies" requirement, and we are satisfied that other circumstances can provide the necessary factual foundation for a finding that a juror is unable to carry out her oath. We find no clear error in Judge Weisberg's determination that that was the case here. What he had observed and heard from counsel about Juror 13's demeanor during trial gave him a

sufficient basis for concluding that an additional instruction "would be very unlikely to be productive." [36]

## D.     Severance

After Israel's and Cheadle's cases were joined, Israel filed an initial motion and thereafter a renewed mid-trial motion for severance.  The trial judge denied the requests, reasoning that it would "be clear to the jury . . . that Mr. Israel is not charged with any charges in connection with the killing of Asheil[]e George or the armed robberies that are related to it."  After the jury verdicts, Israel filed a motion for a new trial in which he argued that he was prejudiced by the denial of severance, and in particular by the prejudicial effect of the reluctance of the Kenyon Street witnesses to testify against Cheadle. [37]  He now challenges the denial

---

[36]     Because we conclude that Judge Weisberg properly exercised his discretion under Rule 24 (c), we need not consider the impact of the post-verdict information about Juror 13's lack of eligibility, the parties' arguments about whether the government may raise a post-verdict challenge against an allegedly biased juror, or their arguments about whether the government waived such a challenge in this case by failing to bring its allegations to the court's attention during trial.

[37]     Israel acknowledges that the reluctance of Morris and Matthews to testify "was admissible to prove the charged obstruction conspiracy[,]" but argues that the reluctance of the Kenyon Street witnesses was inadmissible as to him.

of his new-trial motion.  As we understand his argument, it is that, in the absence of a limiting instruction from the court, the "spillover prejudice" of the reluctance of the Kenyon Street witnesses likely led the jury to "impute[] the cause of the Kenyon Street witnesses' reluctance" to testify to Israel."[38]

We are not persuaded by Israel's argument.  We think it would have been clear to the jury that the government's case against Israel for obstruction of justice rested not on broad inferences of intimidation from the demeanor of government witnesses, but on a claimed earwitness account of Israel's statements about the need to kill individuals who might testify against Cheadle (for example, Haynes's testimony that Israel told him that "Little MoMo" and "Little Clay" had to be killed because they were "telling on" Cheadle) and on Haynes's claimed eyewitness account of Israel's shooting of Johnson, whom he told Haynes he was planning to kill because he was "telling" about Cheadle's involvement in the Atkins murder.  Given that evidence, and the lack of evidence that Israel was feared by the Kenyon Street witnesses, we see no reasonable possibility that the

---

[38]    We review for abuse of discretion Israel's claim that the denial of severance required a new trial.  *Castillo-Campos v. United States*, 987 A.2d 476, 492 (D.C. 2010).  "A finding of abuse of discretion requires a determination that a joint trial did in fact result in an appellant being denied a fair trial and due process of law."  *McCoy v. United States*, 760 A.2d 164, 184 (D.C. 2000) (quoting *Jackson v. United States*, 329 A.2d 782, 787 (D.C. 1974)).

jury's verdict convicting Israel of the charged conspiracy to obstruct justice was swayed by the obvious reluctance of the Kenyon Street witnesses (some or all of whom presumably would have been called to testify to establish the background of the conspiracy to obstruct justice charge,[39] and presumably would have demonstrated the same reluctance, even if Israel had been tried separately).

### E. Denial of a New Trial Notwithstanding Cheadle's Weight-of-the-Evidence Arguments

Cheadle argues that the trial court abused its discretion in denying his motion for a new trial, which was premised on an argument (1) that the government's case against him "included no meaningful physical or forensic evidence" and "consisted almost entirely of hearsay and contradicted testimony from interested witnesses" and (2) that therefore the jury's verdicts were against the manifest weight of the evidence. More specifically, Cheadle argues that, in light of Atkins's motive to kill George, Matthews's and Johnson's motives to falsely implicate Cheadle in the murder of Atkins (Matthews, to deflect suspicion

---

[39] As Judge Weisberg observed after hearing all the evidence, "most of the evidence of the first two murders [including the murder of George on Kenyon Street] was necessary to place in context the murder of Pierre Johnson, an overt act in furtherance of that conspiracy, with which defendant Israel was charged and convicted."

from himself, and Johnson, to curry favor with prosecutors), and Matthews's recanting of his earlier statements during his trial testimony, the evidence weighed against a finding that Cheadle killed George and Atkins.

We discern no abuse of discretion in the court's ruling. To convict Cheadle of the felony murder of George, the government was required to prove that Cheadle aided and abetted in the robbery during which George received a fatal gunshot wound and that George's killing was "done in furtherance of the common design or plan to commit the [underlying] felony, or [was] the natural and probable consequence of acts done in the perpetration of the felony." *In re D.N.*, 65 A.3d 88, 93 (D.C. 2013) (internal quotation marks omitted). It is undisputed at trial that an armed robbery took place on Kenyon Street, during which George was fatally shot. The testimony about Cheadle's subsequent statements to Beach, Matthews, and Johnson was evidence of Cheadle's involvement in the robbery; Cheadle's statement to Beach placed him on Kenyon Street; Cheadle explained to Matthews that a gunshot wound to his mouth, which he suffered on the night of the attempted robbery and murder, was sustained while he was "on a mission to rob somebody"; and Cheadle made a similar statement to Johnson.[40] Those statements by Cheadle

---

[40] Further, while no eyewitnesses placed Cheadle at the scene, one eyewitness, Tamara Wilson, identified Atkins as one of the robbers, and

(continued…)

were neither hearsay nor contradicted, and the timing of Cheadle's gunshot wound was strong circumstantial evidence of his participation in the Kenyon Street robbery and thus of his guilt of the felony murder of George. For that reason, the trial court did not abuse its discretion in concluding that the evidence weighed in favor of findings that Cheadle participated in the robbery and that George's murder was a result of and in furtherance of that robbery.

There also was strong evidence of Cheadle's guilt of the Atkins murder. Matthews's statements to the grand jury provided evidence indicating that, immediately before Atkins was shot, he was in a room with Cheadle, whom Matthews saw pull out a gun. Morris testified that, before hearing additional shots fired, she saw Matthews flee, with nothing in his hands, from the room where he had been with Atkins and the man she later identified from a photo array as Cheadle. Additionally, Johnson told the grand jury that Cheadle had described his involvement in the Atkins killing. Cheadle stresses Matthews's recanting of his testimony during trial, but the jury, having heard evidence that Johnson was murdered to prevent any further testimony against Cheadle and that appellants discussed killing Matthews as well, could reasonably credit Matthews's statements

---

(...continued)

government evidence showed that Cheadle later shot and killed Atkins because he was worried that Atkins might implicate him in the murder of George.

to the grand jury over his trial testimony denying that he had any memory of the Atkins murder, and could also infer that Johnson was killed to prevent his truthful testimony. Cheadle also stresses Morris's admission that she lied to police and the grand jury regarding her drug use and the drug activity in her apartment at the time of the Atkins murder, but his attack on Morris's general credibility did nothing to suggest that Morris had any motive to falsely identify Cheadle as the shooter. Against this backdrop, we cannot conclude that the trial court erred in finding that the weight of the evidence supported Cheadle's conviction for the Atkins murder.

Cheadle's next argument (one that reads more like an insufficiency-of-the-evidence argument than a weight-of-the-evidence argument) is that the evidence was insufficient to implicate Israel in the murder of Johnson — and, by extension, insufficient to link him to Johnson's murder. Cheadle emphasizes that no murder weapon was ever found, and that there was no physical evidence linking Israel to the crime. Further, Cheadle highlights, the sole eyewitness who identified Israel as Johnson's killer — Haynes — was heavily impeached[41] and gave testimony that

---

[41] Cheadle's trial counsel elicited that Haynes had agreed to testify against Israel in exchange for the government's agreement not to prosecute Haynes on four armed robbery charges.

was contradicted by other evidence about the shooting.[42]  Additionally, at the time

the crime occurred, Haynes was staying at a halfway house, and although being

absent at the time of the shooting would have violated his curfew, no record of

such a violation was introduced into evidence.[43]  Nonetheless, having viewed the

demeanor of the witnesses,[44] and benefitting from his superior vantage point with

respect to the entire trial, Judge Weisberg was well-positioned to weigh the

---

[42]  For example, Haynes testified that Israel approached the scene wearing a "little mask covering his mouth" and that, when he produced his gun, "everybody started scattering away, trying to get away" before Israel started shooting. However, defense witnesses Primavere Charles and Jeanne Kim did not remember anyone wearing a mask and did not see people disperse until after the shooting had stopped.  Haynes also testified that after the shooting, Johnson ran through a parking lot and into an alley, but Charles testified that Haynes ran down W Street towards 15th Street.  Haynes testified that Johnson was shot in the back of his neck or head as he attempted to flee, but forensic and medical experts testified that Johnson had most likely not initially been shot from behind.

[43]  Haynes explained that residents, with the cooperation of the midnight shift workers at the halfway house, would routinely break curfew by leaving at night against the house rules, but recording on sign-out forms that they were leaving the following morning.  Haynes claimed that, using this arrangement, he left shortly before midnight on the night of Johnson's murder, but signed out as though he were leaving the following morning.  Employees of the halfway house testified at trial that they had never let an inmate leave without authorization and were aware of no such scheme.

[44]  *See Forbes v. United States*, 390 A.2d 453, 459 (D.C. 1978) ("In reviewing a trial court's denial of a motion for new trial, we must give great weight to the trial judge's ability to judge the credibility of the witnesses and to observe their demeanor.").

conflicting evidence as the "thirteenth juror."[45]  We cannot say that the evidence was so weak as to render his denial of Cheadle's new-trial motion an abuse of discretion.

Cheadle further contends that the government failed to establish a single overarching conspiracy to obstruct justice.  Relying on *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988), he argues that, at most, the evidence proved only various "spokes," allegedly connected to the "hub" of Cheadle, that never acted in coordination with each other and thus were not contained by any "rim" within a single conspiracy.  He emphasizes that the evidence did not "show that the co-conspirators depended on or coordinated with one another in any substantial way to complete their respective tasks[.]"  However, as the *Tarantino* court recognized, "[a] single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective" and may be established even if some conspirators are ignorant of the identities of other participants and even when the various contributions to the enterprise are distinct in time.  *Tarantino*, 846 F.2d at 1392.  More to the point, the evidence was sufficient to permit the jury to conclude that Cheadle killed Atkins, Israel killed

---

[45]  *Tibbs v. Florida*, 457 U.S. 31, 42 (1982); *United States v. Bamiduro*, 718 A.2d 547, 553 n.14 (D.C. 1998) (internal quotation marks omitted).

Johnson, and both appellants intimidated Matthews pursuant to a conspiratorial agreement between the two of them, the objective of which was to obtain Cheadle's acquittal of the murders with which Cheadle was charged.

Cheadle contends that the government's evidence suggested only that he "had inquired about who might appear at trial, not that he was trying to prevent them from doing so[.]" However, there was evidence from which the jury could infer appellants' participation in an unlawful agreement to obstruct justice. "A conspiratorial agreement may be inferred from circumstances that include the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators." *Campos-Alvarez v. United States*, 16 A.3d 954, 965 (D.C. 2011) (internal quotation marks and alterations omitted). The jury heard, *inter alia*, a recorded phone call in which Cheadle and others discussed the possibility that Matthews might testify and how to handle the situation; Haynes's testimony that Cheadle and Israel had grown concerned about Matthews cooperating with the government; Haynes's testimony that, although Cheadle wanted to kill Matthews, Israel argued that he should be allowed to live but kept out of the prosecution's reach, and then arranged for Matthews to hide out with Israel's aunt; testimony that Latoya Villines, a friend of Cheadle, visited Matthews in jail at Cheadle's direction

to discuss Matthews's anticipated trial testimony; and Haynes's testimony that, when Cheadle told Israel of his suspicions about Johnson, Israel replied that "he was going to take care of [Cheadle] because he kn[e]w if he was in a situation like that, [Cheadle] would take care of it for him[.]" Taken together, the foregoing evidence supported an inference that both Cheadle and Israel were participants in an agreement to prevent witnesses from testifying against Cheadle.

### III.    Conclusion

For the foregoing reasons, the judgments of conviction and the rulings of the trial court denying appellants' new-trial motions are

*Affirmed*.